# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 19, 2013

# STATE OF TENNESSEE v. CHRISTOPHER LEE SHAW

**Appeal from the Criminal Court for Davidson County**
**No. 2011-A-15     Cheryl A. Blackburn, Judge**

---

**No. M2012-01437-CCA-R3-CD - Filed September 20, 2013**

---

A Davidson County jury convicted the Defendant-Appellant, Christopher Lee Shaw, of possession of more than twenty-six grams of cocaine with the intent to sell or deliver within 1,000 feet of a child care agency, a Class B felony; evading arrest while operating a motor vehicle, a Class E felony; and possession of drug paraphernalia, a Class A misdemeanor. Shaw received an effective sentence of fifteen years in the Tennessee Department of Correction. The sole issue presented for our review is whether the evidence supporting Shaw's drug-related convictions was sufficient to establish constructive possession. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and JEFFREY S. BIVINS, JJ., joined.

James (Jay) O. Martin, III (on appeal) and Jeremy Parham (at trial), Nashville, Tennessee, for the Defendant-Appellant, Christopher Lee Shaw.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Victor (Torry) S. Johnson, III, District Attorney General; and Jeff Burks, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This case stems from a citizen complaint of "a problem" with the Defendant-Appellant, Christopher Shaw, in or around a Goodlettsville, Tennessee apartment complex. On October 7, 2010, the date of the offense, the citizen notified the police of Shaw's presence in her apartment complex. An unmarked police car followed Shaw as he left the apartment complex and eventually initiated a traffic stop. Shaw, driving a white SUV,

stopped but quickly sped away before officers could approach. Following a brief chase, the SUV struck a fire hydrant and wrecked a short distance away from the initial stop. When the officers approached the wrecked SUV, Shaw was not present at the scene. Approximately five minutes later, Shaw was apprehended in a residential area two blocks from the scene of the wreck. Drugs and drug paraphernalia were recovered from the SUV as well as from Shaw's person. Based on these events, Shaw was charged with possession with intent to sell or deliver twenty-six grams or more of a substance containing cocaine within 1,000 feet of the real property that comprises a child care agency, evading arrest while operating a motor vehicle where the flight or attempt to elude creates a risk of death or injury to innocent bystanders or other third parties, and possession of drug paraphernalia. The following proof was adduced at trial.

Ms. Rosetta Williams and Ms. Patricia Taylor, mother and daughter, resided in an apartment complex in Goodlettsville, Tennessee. In January 2010, they contacted the Goodlettsville Police Department (GPD) to report a "problem" with an individual who frequently visited their apartment complex driving different cars. The problem with the individual was not described in any detail at trial.[1] In September 2010, Ms. Williams met with Detective Les Carlisle and was advised to copy the tag numbers of the different cars in an effort to identify the individual. Ms. Williams was also advised to notify the police the next time she observed the individual in the area. Ms. Taylor assisted her mother in collecting the tag numbers of the different cars driven by the individual when he came to their apartment complex.

Ms. Williams testified that she observed the individual at the complex at least ten times. Ms. Taylor said that she observed the individual at the complex at least three or four times a day. At some point prior to the offense, Detective Carlisle investigated the tag numbers of the cars provided to him by Ms. Williams and determined that they were registered to Shaw. A photograph of Shaw was then shown to Ms. Williams and Ms. Taylor, each of whom identified Shaw as the man they had seen in their apartment complex. One of the cars Ms. Williams had observed Shaw driving while in their complex was a white Nissan SUV with tag number "Titan 18TF03." She had reported the tag number to Detective Carlisle prior to the offense date.

On the day of the offense, Ms. Williams and Ms. Taylor were sitting on Ms. Williams's porch and observed Shaw drive a white SUV into their complex. Ms. Williams observed Shaw exit the white SUV and walk upstairs to the apartment complex. Both Ms. Williams and Ms. Taylor testified that they recognized Shaw and called Detective Carlisle to notify him that Shaw was at the apartment complex. Neither Ms. Williams nor Ms. Taylor

---

[1] The substance of the problem was excluded by motion prior to trial.

recorded the tag number on this occasion, but they identified the car as the same white SUV they had seen Shaw driving on previous occasions in their apartment complex. Later, Ms. Taylor and Ms. Williams watched through the window as Shaw returned to the SUV and began to drive away. Ms. Williams called Detective Carlisle and advised him that Shaw was leaving the apartment complex.

Detective Les Carlisle of the Goodlettsville Police Department testified and confirmed that he investigated a complaint by Ms. Williams concerning an individual frequenting her apartment complex. In response to Ms. Williams concerns, Detective Carlisle advised her to copy the tag numbers of the different cars and to notify him the next time the individual was at her apartment complex. He confirmed that Shaw was later identified as the subject of Ms. Williams's complaint. On the day of the offense, Detective Carlisle received a phone call from Ms. Williams and, along with Detective Joseph Bardeal, he drove to her apartment complex in an unmarked car. Detective Carlisle also called Sergeant Gene Martin of the Metropolitan Police Department, who was already familiar with the investigation and identity of Shaw, and requested the assistance of additional marked police cars.

Detective Carlisle received another phone call from Ms. Williams as he neared the apartment complex exit. She advised him that Shaw was leaving the complex. He then observed Shaw driving out of the complex in a white SUV. Detective Carlisle testified that Shaw was the only person in the SUV. He followed the white SUV south on Dickerson Road and verified its tag number as one previously given to him by Ms. Williams. Detective Carlisle then called Sergeant Martin to coordinate a plan to initiate a traffic stop of Shaw's SUV.

Detective Carlisle continued to follow the white SUV in a northbound direction to an intersection, and Sergeant Martin and other uniformed officers were waiting for Shaw in the southbound direction on the other side of the intersection. Sergeant Martin and Detective Carlisle surrounded Shaw and activated their blue lights. Sergeant Martin's car was in front of the SUV, and Detective Carlisle's car was behind the SUV. Detective Carlisle testified that Shaw "paus[ed] just for a few seconds . . . pull[ed] around [a] police car, and [took] off." Detective Carlisle followed the SUV until Shaw turned left off of Brick Church Pike, at which point he lost sight of the car. A white SUV, which Detective Carlisle confirmed as the same SUV driven by Shaw, later crashed into a nearby fire hydrant. Shaw was not present at the scene. After a short foot chase, Shaw was arrested in a creek behind a residential area. Detective Carlisle identified Shaw as the driver of the white SUV that had crashed into the fire hydrant.

-3-

On cross-examination, Detective Carlisle acknowledged that the white SUV was not registered to Shaw. He had no knowledge of the owner of the car or of who drove it earlier that day.

Officer Mike Wilson testified that he was familiar with the investigation and Shaw's identity in October 2010. On the day of the offense, Officer Wilson was in uniform, drove a marked police car, and participated in the search and pursuit of Shaw. He testified that Shaw was the driver of the white SUV and that he did not observe any other occupants inside the SUV. When Officer Wilson attempted to block Shaw's SUV, Shaw "stopped for a split second and then drove around us and began driving erratically away." Officer Wilson continued to follow Shaw but eventually lost sight of the SUV.

After turning onto a few residential streets in the area, Officer Wilson observed the same white SUV after it had crashed into a fire hydrant at the intersection of Oak Valley Drive and Oak Ridge Drive. Officer Wilson testified that Shaw was no longer in the SUV. He further estimated that there were "two minutes at the most" between the moment when Shaw initially evaded the police and the moment when he saw the wrecked SUV at the fire hydrant. Five minutes after Officer Wilson arrived at the scene of the wreck, Shaw was apprehended "a block or two away." Shaw was brought back to the scene of the wreck, and Officer Wilson identified him as the driver of the SUV that had crashed into the fire hydrant.

Officer Wilson conducted a search of the SUV and recovered a round piece of crack cocaine, a baggy of cocaine powder, and a set of digital scales. He said the baggy of cocaine powder "was still compressed and appeared to have been chipped off of a kilo block." The bag of cocaine powder was plainly visible in the front console, the piece of crack cocaine was in a cup holder wrapped in a paper towel, and the scales were in the passenger side front floorboard. A field test of each item was positive for cocaine base. The powder cocaine weighed 7.8 grams, and the crack cocaine weighed 32.5 grams. Officer Wilson also field tested a substance recovered from Shaw's pants, which was positive for cocaine base and weighed 3.5 grams. He stated that $1,070.00 was taken from Shaw's person in the following denominations: three $100 bills; thirty-five $20 bills; four $10 bills; and six $5 bills.

On cross-examination, Officer Wilson testified that he also found a traffic ticket issued to Adrian Wilkerson, a known drug dealer. He was unable to determine where the digital scales that were recovered from the SUV were located before it crashed into the fire hydrant, and he agreed that the scales may have shifted during the crash. Officer Wilson further agreed that the driver of the SUV may have been unaware of the presence of the crack cocaine because it was wrapped in a paper towel. Finally, Officer Wilson said he did not subject the items recovered from the SUV to fingerprint analysis or testing.

Detective Christopher Jones testified that on the day of the offense he and his partner, Officer Truan, participated in the search of Shaw following the wreck involving the white SUV. Detective Jones said he heard from radio dispatch that Shaw "had bailed on foot somewhere off Oakwood off Dickerson Road." His squad car was equipped with computer equipment which enabled him to retrieve a description and photograph of Shaw. He heard from dispatch that Shaw had been observed in the backyard of a residential area and proceeded in that direction. As he approached the area, he observed Shaw, seated in another car, a light colored Lincoln Mark VIII, at the intersection of Larkspur and Ewing Street. A female was driving the car, Shaw was in the front passenger seat, and another female passenger was in the backseat.

Detective Jones activated his lights and siren, and Shaw jumped out of the car and began to run. Detective Jones initially followed Shaw in his car, and his partner chased Shaw on foot. They attempted to "box in" Shaw; however, the female driver of the Lincoln obstructed the pathway of Detective Jones's squad car. Consequently, Detective Jones lost control of his car and crashed into a rock wall. He then chased Shaw on foot behind a creek and unsuccessfully deployed his taser. Detective Jones said that he eventually grabbed Shaw, pulled him to the ground, and took him into custody.

Ms. Linda Williams testified that she worked at Martha's Learning Enrichment Center, a daycare center located at 108 Oak Valley Drive, Nashville, Tennessee. On the day of the offense, Martha's Learning Enrichment Center was an active, operating daycare center. Mr. David Kline, an employee of the Metropolitan Nashville Planning Department, testified that three different day care centers, including Martha's Learning Enrichment Center, were located "exactly" 1,000 feet from the intersection of Oak Valley Drive and Oak Ridge Drive.

The testimony of Sergeant Gene Martin corroborated in large part the testimonies of Detective Carlisle and Officer Wilson regarding the events leading up to the offense. Sergeant Martin also testified that on the day of the offense he was contacted by Detective Carlisle and participated in the search and pursuit of Shaw. He issued a radio advisory, which contained Shaw's name, appearance, and location. During the traffic stop, Sergeant Martin observed an individual driving the SUV but was unable to confirm his identity. He said Officer Wilson was closer to the SUV and had a better view of the driver. Officer Martin said that after the SUV sped away, he did not observe Shaw until after he was in custody. He described Shaw as "soaked and dirty" and "tired . . . like he had just been running." He said that Shaw's pants were soaked and fell down to his ankles. He took Shaw's pants off and gave them to Officer Alan Earls.

Sergeant Martin confirmed that Shaw did not own the SUV, a Nissan Armada, and that it was not stolen. He testified that the SUV was not registered to Shaw and that it was

never claimed by anyone after the wreck. He explained that he did not require the "I.D. Unit" to process the SUV:

> [W]e knew the subject that was driving the vehicle. He was being followed to a point. And then Officer Wilson and myself followed him to another point. And then we followed him to the next point in the creek. It was a matter of minutes. So we knew who was going to be driving the vehicle and who was in the vehicle, who had got out of the vehicle. So . . . there was not a need to process the vehicle.

Finally, Sergeant Martin said that, in his experience, processing a vehicle did not always result in fingerprints.

Officer Alan Earls searched Shaw's pants and found "a large wad of money" and a baggy containing a white, powdery, rock-like substance. Officer Earls testified that the substance appeared to be drugs. He took a photograph of the money, which was shown to the jury. He gave the money and the powdery substance to Officer John Tuberville, who later gave them to Officer Wilson. Officer Earls described a series of photographs taken of Shaw after his arrest. The photographs showed Shaw, dressed in his boxer shorts, immediately after he had vomited. Officer Earls said, in his experience, it was common for an individual to vomit after ingesting drugs and running from the police.

Officer John Tuberville testified that he participated in the search and pursuit of Shaw on the day of the offense. After receiving information from the other officers that the suspect was running through a creek, he drove up a driveway in the residential area near the scene of the wrecked SUV. He observed Officer Traun and Sergeant Martin take Shaw into custody. He confirmed that 3.5 grams of powder cocaine and $1,075.00 were recovered from Shaw. He drove back to the scene of the wreck and gave the drugs and money to Officer Wilson. While at the scene, Shaw vomited and "started going into convulsions, having muscle spasms that were uncontrollable." Officer Tuberville called an ambulance, and Shaw was taken to the hospital. Officer Tuberville later obtained warrants for Shaw's arrest. Officer Tuberville's arrest report indicated that Shaw replied "none" for his place of employment. It also noted the tag number of the SUV, which included the symbol "TF" indicating a Titans fan.

Isaac Martinez of the Davidson County Metropolitan Police Department Property and Evidence Division confirmed that Officer Wilson submitted $1,070.00 in cash, drugs, and drug paraphernalia to the property room in connection with this case. The money was initially stored in a safe and later deposited into a bank or treasury department account. He stated that the drugs were initially sealed and placed in a secure location. In response to a

request from the District Attorney's Office, he submitted the drugs to the Tennessee Bureau of Investigation ("TBI") Crime Lab for testing and analysis. He confirmed that he picked up the sealed bags containing the drugs following testing.

Agent John Scott of the Tennessee Bureau of Investigation testified as an expert in the area of forensic chemistry. The larger, solid chunk of crack cocaine recovered from the SUV and the substance recovered from Shaw's pants testified positive for cocaine base and weighed 28.82 grams and 1.41 grams, respectively. Agent Scott added the individual weight of each drug and "round[ed] off" or "truncated" it to arrive at a total combined weight of 30.2 grams. The white powdery substance recovered from the SUV tested positive for the presence of cocaine and weighed 6.8 grams.

William Mackall, a lieutenant with the Narcotics Interdiction Unit and DEA Task Force, testified as an expert in the filed of undercover narcotics investigations. He distinguished between crack cocaine users and sellers and said that users "always [had] a crack pipe on them" and did not have money with them. He further opined that Shaw intended to sell or deliver the drugs recovered in this case based on the amount and appearance of the drugs, the amount and denominations of the cash recovered from Shaw, and the presence of the digital scales. On cross-examination, Lieutenant Mackall conceded that he had seen drug users, who were not sellers, with large amounts of money. Additionally, he testified that 1.41 grams of cocaine, the equivalent of 6 or 7 "hits," was not an unreasonable amount for a user to purchase.

By stipulation, the parties agreed that Officer Thomas Simpkins of the Metropolitan Nashville Police Department analyzed the evidence in relation to this case and that "no prints were developed from any of the items submitted."

Ms. Lauren Rolston testified on behalf of Shaw. She lived in the same apartment complex as Ms. Williams and Ms. Taylor. She "knew of Shaw" because they grew up in the same neighborhood. She testified that she had never seen Shaw driving a white Nissan SUV in her apartment complex. Ms. Rolston explained that she did hair for extra money at her apartment. She specialized in "locks or dreds" and identified several photographs of African American men with that type of hairstyle. She testified that Mr. Wilkerson, the registered owner of the wrecked SUV, was a hair client of hers and the father of her best friend's son. She said he "always" visited her apartment in October 2010. She was certain that Shaw was not in her apartment complex on the day of the offense.

Ms. Amber Phillips, another friend of Shaw's, testified that Shaw spent the night at her home on October 6, 2010, and was with her all morning. She said he then rode in her car, a cream-colored Infiniti J30, to pick up a mechanic. Phillips said that the money recovered

from Shaw was intended to pay the mechanic for repairs to her car. When the police approached her car with their blue lights on, Shaw jumped out of the car without explanation.

Based on the above proof, the jury convicted Shaw of possession of more than twenty-six grams of cocaine with the intent to sell or deliver within 1,000 feet of a child care agency, evading arrest while operating a motor vehicle, and possession of drug paraphernalia. This timely appeal followed.

## ANALYSIS

Shaw contends that the evidence was insufficient to support his convictions for possession with intent to sell or deliver more than twenty-six grams of cocaine within 1,000 feet of a day care and for possession of drug paraphernalia. He argues that the evidence failed to prove that he knew that the drugs or the scales were located in the SUV. He asserts that he should only be held accountable for the 1.41 grams of drugs found on his person.[2] In response, the State contends that a rational jury could have found that Shaw possessed the drugs and the scales found in the SUV with the intent to sell the drugs and to use the scales in that process. Upon review, we agree with the State.

We begin our analysis of this issue by recognizing well established law concerning an appellate court's review of the sufficiency of the evidence. The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

---

[2] Shaw does not contest the sufficiency of the evading arrest conviction and advocates for a remand of this matter for entry of a judgment of conviction for simple possession of a controlled substance based on his possession of contraband recovered from his pants.

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

Shaw was convicted of possession of more than twenty-six grams of cocaine with intent to sell or distribute within 1,000 feet of the real property of a childcare center. In order

to sustain a conviction for this offense, the State was required to prove beyond a reasonable doubt that Shaw knowingly "possess[ed] [cocaine] with intent to manufacture, deliver or sell [cocaine]." T.C.A. § 39-17-417(a)(4) (2010). A violation of subsection (a) with respect to twenty-six grams or more of cocaine is a Class B felony. Id. § 39-17-417(i)(5). In addition, the Drug-Free School Zone Act states that a violation of Tennessee Code Annotated section 39-17-417 "that occurs on the grounds or facilities of any school or within one thousand feet (1,000) of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center or park shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation." Id. § 39-17-432(b)(1) (2010). However, "[a] person convicted of violating this subsection (b), who is within the prohibited zone of a preschool, childcare center, public library, recreational center or park shall not be subject to additional incarceration as a result of this subsection (b) but shall be subject to the additional fines imposed by this section." Id. § 39-17-432(b)(3). In other words, a defendant convicted of selling twenty-six grams or more of cocaine, ordinarily a Class B felony, would be punished for a Class A felony if the defendant sold the drug within 1,000 feet of a public or private elementary, middle, or high school. However, subsection (b)(3) specifically exempts preschools, childcare centers, and other areas from incarceration at the higher classification in subsection (b)(1). Therefore, because Shaw was a Range II, multiple offender, and because his offense occurred within 1,000 feet of a childcare center, he was sentenced for a Class B felony and was subject to a sentence range of twelve to twenty years. Id. § 40-35-112(b)(2) (Supp. 2010). In addition, he was required to serve "at least the minimum sentence for [his] appropriate range" at 100%. Id. § 39-17-432(c), (d), (e). Here, the trial court ordered Shaw to serve a fifteen year sentence for this offense, with twelve years at 100% and the remaining three years at 35%.

In order to sustain Shaw's conviction for possession of drug paraphernalia, the State was required to prove beyond a reasonable doubt that Shaw possessed digital scales with the intent to use them to prepare a controlled substance. Id. § 39-17-425(a)(1)-(2) (2010). A violation of this subsection is a Class A misdemeanor. Id.

Tennessee courts have long recognized that "'[p]ossession' [as used in the drug statutes] may be either actual or constructive." State v. Robinson, 400 S.W.3d 529, 534 (Tenn. 2013) (citing State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001)). Constructive possession depends on the totality of the circumstances in each case and may be based on circumstantial evidence. Id. at 534. Constructive possession is established when a person knowingly has "'the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981) (quoting United States v. Craig, 522 F.2d 29, 32 (6th Cir. 1975)). It has also been defined as "the ability to reduce an object to actual possession.'" Id. at 125

(quoting United States v. Martinez, 588 F.2d 495, 498 (5th Cir. 1979)). However, "[t]he mere presence of a person in an area where drugs are discovered is not, alone, sufficient." State v. Bigsby, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000) (citing State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987)).

In challenging the sufficiency of the evidence, Shaw contends that the State failed to establish constructive possession because the drugs and digital scales were concealed inside the SUV prior to the crash. He essentially argues that he was merely present in the area where the drugs were found and cites United States v. Bailey, 510 F.3d 562 (6th Cir. 2007), rev'd in part & remanded en banc, 553 F.3d 940 (6th Cir. 2009), as supplemental authority in support of his claim.

In Bailey, a split decision, the Sixth Circuit reversed a defendant's convictions for felon in possession of a firearm and felon in possession of a firearm in furtherance of drug trafficking. The defendant in Bailey was driving a stolen car, and a police officer attempted to stop him. Bailey, 510 F.3d at 564. The defendant refused to stop and was eventually apprehended after attempting to evade police. Id. at 564, adopted by reference, Bailey, 553 F.3d at 942. A post-arrest search of Bailey and the stolen car revealed in Bailey's possession "two baggies of crack cocaine" containing "9.41 grams and . . . 5.50 grams," respectively. Bailey, 510 F.3d at 564. "The officers also found two cellular telephones . . . , and a loaded .357 Magnum and empty holster" under the drive's side seat. Id. The proof established that the handgun was not in the car when it was stolen.[3] "Bailey testified at trial that he was not aware of the gun inside the car; that he did not put a gun inside the car; and that he did not have a gun on his person when he got inside the car." Bailey, 553 F.3d at 946. In reviewing the evidence, the majority found the following "of particular significance": the absence of fingerprints on the gun, the fact that the defendant was not the owner of the car, and the fact that individuals other than the defendant used the car on the offense date. Id. It reversed the defendant's gun related convictions after concluding that there was no evidence establishing constructive possession beyond the fact that the defendant drove the car in which the gun was found. Id. at 950.

Viewed in the light most favorable to the State, we conclude that the evidence was sufficient to support Shaw's drug-related convictions. As an initial matter, Bailey is distinguishable from the instant case. Significantly, unlike the handgun recovered from underneath the defendant's seat in the stolen car in Bailey, a close review of the record in this case shows that a clear plastic bag of powder cocaine was located in the front center console of the SUV Shaw was driving. Officer Wilson testified that it was "just tied and sitting there

_____

[3] A statement from a passenger in the car, who denied possession of the gun and said that the defendant put the gun underneath the seat, was excluded by the Court.

. . . along with [the chunk of crack cocaine]. I saw it first." Moreover, the Court in Bailey was centrally concerned with creating a rule of strict liability that would ensnare individuals who, through no fault of their own, were unaware of contraband in their presence. Id. at 948-49; United States v. Morrison, 594 F.3d 543, 545 (6th Cir. 2010), rehearing and rehearing en banc denied (Mar. 26, 2010). No such danger exists on the facts of this case. Shaw drove a car in which powder cocaine was located in plain view in the front center console. Despite his familiarity with the appearance of cocaine, as evidenced by the drugs recovered from his person, Shaw drove the SUV to the apartment complex, exited and later re-entered the SUV, and again drove away. Certainly, Shaw's proximity to the drugs for the period in which he operated the SUV increased his ability to reduce the drugs to his control.

In addition to the plain view nature of the drugs and Shaw's proximity to and familiarity with the drugs, we find it significant that he was the sole occupant of a car from which a large amount of drugs was seized. See United States v. Shull, 349 Fed. App'x 18, 22 (6th Cir. 2009) (distinguishing Bailey and noting that a significant amount of drugs seized from a car in which the defendant is the sole occupant is a factor upon which a rational trier of fact could reasonably determine constructive possession). Finally, Shaw's repeated attempts to evade police officers imply guilty knowledge of the presence of the drugs and digital scales recovered from inside the SUV. Sotka v. State, 503 S.W.2d 212, 221 (Tenn. Crim. App. 1972) (stating that "[t]he fact that a suspected person attempts to evade arrest or escape . . . taken in connection with other facts may become one of a series of circumstances from which guilt may be inferred."). Based on all of the above factors combined, any rational juror could have found that Shaw was in constructive possession of the drugs and the digital scales in this case. Accordingly, Shaw is not entitled to relief.

## CONCLUSION

We affirm Shaw's convictions for possession of more than twenty-six grams of cocaine with the intent to sell or deliver within 1,000 feet of a childcare center and possession of drug paraphernalia. The judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

-12-